1. "In view of the express requirement as to formal examination by inspection of a person alleged to be a lunatic, the statute . . prescribing the method of determining" the question of insanity (Code, § 49-604) "does not violate the due-process clause of the State or Federal constitution in that it fails to provide for any notice to the person alleged to be insane." Georgia Railroad Bank c. Co. v. Liberty National Bank c. Co., 180 Ga. 4, 9, 10 (177 S.E. 803); Owenby v. Stancil, 190 Ga. 50 (5), 57-60 (8 S.E.2d 7), and cit. Accordingly, the record of the insanity commitment involved in the instant habeas corpus showed no violation of due process in that no advance personal notice of the hearing was given to such person, and such record showed no other violation of due process where, in conformity with the statute, the petition for a commitment was supported by the required affidavit of the petitioner, verified by a physician, as to the necessity for an immediate hearing; and where the "three nearest adult relatives" of the alleged insane person filed a written acknowledgment of service and consent to the immediate hearing; and where the commission, made up of two physicians and an attorney named by the ordinary to report on the sanity of such person, filed their report under oath, conformably to the statute, that, after their "examination" by personal "inspection and proofs as the law requires," they found that she was insane and should be committed to the State hospital; and the ordinary, who was present at the time and place of examination, thereupon adjudged her insane and committed her to the State hospital "until she again be restored to her right reason and sound mind."
2. A habeas-corpus proceeding by or on behalf of a person restrained of liberty determines only "the legality of the detention." The writ is not the proper remedy to bring into review alleged mere irregularities or errors of procedure, or to test the evidence under which the applicant had been committed. Sanders v. Paschal, 186 Ga. 837
(199 S.E. 153); Young v. Fain, 121 Ga. 737 (49 S.E. 731). In cases involving *Page 111 
insanity, the Code, § 49-606, provides a remedy by appeal to the superior court from an adverse ruling by a sanity commission. Accordingly, in a habeas-corpus proceeding involving only the validity of a previous commitment for insanity, based on the return of a sanity commission to the court of ordinary, the facts stated in such record must be accepted as true as against the petitioner, and require no proof; and the court in the habeas-corpus case could not consider testimony to show that the petitioner was not insane at the time of the commitment proceeding. Shiflett v. Dobson, 180 Ga. 23 (2, 3), 26 (177 S.E. 681).
(a) Assuming that if due process was not in fact afforded by the making of an actual personal examination by the insanity commission of the alleged insane person, and that it might be shown in a subsequent habeas-corpus proceeding that there was no actual personal examination by inspection, and no evidence at all as to insanity on which the commission could have acted in making its return of insanity, and that consequently the return was not merely irregular but void, still, in the instant case, the petitioner made no such showing. The testimony for the petitioner by the sheriff, as to what occurred in the examination by the commission at the home of the alleged insane person, did not undertake to show what, if any, proof was made before the commission in the home before their coming into the room where the sheriff and such person were. His testimony did show that when the commission came into that room they personally inspected and "talked to her," although he "paid no particular attention to the conversation between them," and remembered only one thing, as stated in his testimony. Such testimony, as well as her own testimony, showed that the sheriff exhibited to her the insanity commitment before taking her from her home; and that, if sane, she was thus aware of the nature of the proceeding, so as to have availed herself of the legal remedy of appeal.
3. Although the habeas-corpus petition attacked only the constitutionality and validity of the original insanity commitment, and set forth that the alleged insane person was not then insane, without alleging any change in her mental condition since the commitment, the judge admitted testimony on both sides as to her subsequent and present condition. There was testimony as to her normality; but a finding as to her continued insanity was fully authorized by evidence from experts and others in contradiction of her testimony.
4. While there are exceptions to rulings on the introduction of testimony from one of the doctors attending the patient at the State hospital, such exceptions will be treated as abandoned, since they are neither argued nor generally insisted on in the brief for the plaintiff.
Judgment affirmed. All the Justices concur.
 No. 14692. NOVEMBER 11, 1943.
Clint Paul brought a habeas-corpus proceeding before a judge of the superior court, against the superintendent of the State Hospital for the Insane at Milledgeville, to obtain release of Myra *Page 112 
G. Adams, who was being held under a commitment from the court of ordinary of Washington County. The petition alleged, that she had been committed by her parents and others because of her belief and activities as a member of the "Witnesses of Jehovah;" that she was not and is not insane; that she "was not fully informed of the proceedings and was not permitted to know just what it was all about until she was incarcerated;" that she was "tried on a pretended charge of insanity," and "the same was a mere pretended trial or hearing;" that she was thus denied "due process," in violation of the 14th amendment to the Federal constitution; and that her detention violated her rights under the Federal and State constitutions. After hearing the evidence the judge remanded her to the custody of the superintendent.
A certified copy of the commitment proceedings before the ordinary was introduced in evidence. It thus appeared that on January 27, 1943, a petition to the ordinary was filed which set forth that Myra Adams was insane and subject to be committed to the Milledgeville State Hospital, and was accompanied by an affidavit of the petitioner that Myra Adams "is violently insane, and is likely to do herself serious bodily harm," which affidavit was verified by a regular practicing physician of the county. On the same day the father, mother, and sister, as the alleged three "nearest adult relatives" of Myra Adams, filed an acknowledgement of service and consent to immediate issuance of a commission to investigate her sanity; and the ordinary issued a commission to two physicians and an attorney, directing them to "personally examine" Myra Adams "by inspection, and to hear and examine witnesses on oath, if necessary, as to her condition," and to make return to the ordinary as to the result of their inquiry. On the same day the persons named as commissioners filed with the ordinary, as a part of the commitment record, their oaths to well and truly execute the commission; and their signed return that they had made the "examination" required by the commission "by inspection and proofs as the law requires;" and that they "find the said Myra Adams to be insane and fit subject for the Milledgeville State Hospital." Thereupon the ordinary entered a judgment that she was insane, and that as such she "be committed to the . . State hospital until she again be restored to her right reason and sound mind." *Page 113 
For the petitioner, Mr. and Mrs. W. R. Cox and W. B. Cox, of Sandersville, where Myra G. Adams had lived and was committed to the State hospital at Milledgeville, were permitted to testify as to her activities as a "pioneer worker" in "Jehovah's Witnesses," in which they were all members. They testified, that they had known and seen her in Bible classes; that she was perfectly sane and normal; that her parents had opposed her carrying on this work in "calling upon the people from house to house," and had threatened that "they would have her locked up in Milledgeville" if she did not desist from so calling on people. Clint Paul, the petitioner, testified that he was "one of Jehovah's Witnesses," and had known Myra G. Adams since "she first became interested in the truths proclaimed by the Watchtower Bible and Tract Society about two years ago;" that he had attended with her a convention of the organization at Birmingham, Alabama, in September, 1942, and knew her in "our ministerial work;" that "she acted perfectly normal in every way, and was about her Christian work just as other normal people would," and "is not insane;" and that her parents had told him, "We are not going to have Myra going from door to door in that work." Mrs. Paul testified to like effect. Thelma Barbaree, another of "Jehovah's Witnesses" at Milledgeville, testified that she had known Myra G. Adams only a short time, but had one "short talk" with her at the hospital, in which "she talked normal as usual and very desirous of getting free" to "continue her ministerial work."
Myra G. Adams testified as to her religious activities and the opposition of her parents; that "it is true that our message exposes religion as a snare of the worst kind, and that it is not in any wise related to Christianity which is true worship of Almighty God." As to her commitment, she swore: "I heard some people drive up at the front and recognized the sheriff of the county, A. W. Smith, whom I have known over a period of years, and the ordinary, and a couple of other men. They came into the living room. Dr. Leonard, one of the party, called for me and asked what kind of literature I was distributing. I told him that it was published by the Watchtower Bible and Tract Society, and that I would be glad to give him a copy. I gave him a copy of one of the books, and each of the other men a copy also. Thereupon they left, and the sheriff showed me a paper and asked me to go to town with *Page 114 
him; he did not stop in town but took me on to Milledgeville."
A. W. Smith, the sheriff, testified for the petitioner, that he had accompanied the two doctors and the county attorney, members of the insanity commission, with the ordinary to the Adams home: that these persons went into a room adjoining the one where the sheriff was; that "the commissioners came back into the room where he and Myra Adams were talking, and talked to her; that they had some conversation with her, but that he paid no particular attention to the conversation between them, but he did remember one of the doctors asked her as to what kind of literature she was distributing; that she told him what kind, and gave each a copy of some book; that she afterwards went back into her room, and the ordinary and the others left the house; that he then called Myra and told her he had a paper for her and wanted her to go to town with him; that he then took her to the State hospital; and that was all that took place, but there was nothing unusual about the hearing."
For the respondent, the State superintendent, W. L. Adams, father of Myra G. Adams, testified that, four years before his daughter joined the "Jehovah's Witnesses," the witness "noticed a change in her conduct, and attributed [this] to her mental condition," which he regarded "as being weak;" that on one occasion she had left home and had been seen sitting on the side of the road about three or four miles from her home, about night; that she refused to return home with him, but finally came back with some one else he had sent for her; that she explained her presence on the road by saying that "she was on her way to Augusta to get a job;" that "all of this happened before she became a `Jehovah Witness;'" that he had previously "considered that he might have to ask that she be committed to the Milledgeville State Hospital for treatment, and . . had discussed the matter with the ordinary . . about the possibility of such commitment. Although he felt that with her at home with the family they might take care of her without hospital treatment, and . . he wanted to keep her at home if he could . . after Myra became a member of the `Jehovah Witnesses,' he did not protest; and that her condition continued the same until she became one of the workers and spent her days away from home, visiting from house to house in the homes of all sorts of people, frequently in homes where only the male *Page 115 
members of the family were present; that he became fearful for her safety, and tried to prevail upon her to case this kind of work; that she persisted that she should do this work, and became very angry and violent when he talked to her about it;" that he "loved his daughter, and would do anything in his power to save her and aid her recovery, but he thought the place for her was the Milledgeville State Hospital until she recovered from her present condition;" and that he "did not care what her religious opinions were, but knew that she was mentally weak, and her conduct made it unsafe for her in the community."
Mrs. Grandy, a sister of Myra G. Adams, testified for the respondent, that "she and other members of the family had for several years noticed a change in Myra, and . . she attributed this change to her mental weakness; that she had noticed Myra had fits of temper and sometimes quite violent, and that was not her usual way; that she at first thought these exhibitions were such as many normal people on occasions showed, but later, on account of their frequency and violence, and being directed against her father and mother, she attributed them to mental unbalance;" that she knew of "Myra's peculiar acts after she had separated from her husband and that her mental condition existed prior to her becoming a member of the `Jehovah Witnesses' organization" about two years ago; that she did not believe in Myra's religious ideas, but had no objection to her sister having them; that she gave her money to make a trip to a meeting or convention of "Jehovah Witnesses" in Birmingham, Alabama, believing at the time that the trip would please her and that she would improve; that afterwards Myra became a worker for the organization, and began to travel through the country on foot visiting from house to house, entering into the homes of all sorts of people in places where the witness felt she was unsafe, frequently returning from these trips after dark, and when she tried to get her to stop this work, Myra became very angry, violently so, and vented her temper on all the family including the father and mother; that none of the family had any bitterness toward her, they all worried over her condition, and wished for her recovery of "her balance," so as to "be able to leave the hospital;" that it was not safe for her "to travel on foot through the country, remaining away from home until after dark, and going into houses of all sorts of people;" and that Myra had been well treated in the home. *Page 116 
Dr. John B. Wiley, the physician at the State Hospital where Myra was admitted on January 27, 1943, who examined her on February 3 and 9, testified, that he had sixteen years of experience with insanity cases, and was qualified "to pass on the question of sanity or insanity;" that Myra had told him that "the devil was responsible for her domestic troubles, and that scales had been removed from her eyes;" that she had talked much of distributing Bible literature and organizing Bible classes, and "admitted a hallucinatory experience lasting ten or fifteen minutes, when she saw a beautiful vision of the New Jerusalem, a city with streets lined with gold and all houses heavenly;" that "taking her examination as a whole, he diagnosed her case as dementia praecox;" and that this diagnosis "was concurred in by the members of the hospital staff present." Dr. R. V. Lamarr testified, that he was the doctor of Myra Adams when she was transferred from the reception ward to his services about three months before the hearing, and since that time she had been under his care and observation; that she "was insane," and "her kind of insanity is dementia praecox." The witness then requested permission "to ask a few questions of Myra Adams in order to prove his finding correct," based on facts and experiences of a lifetime "during which many sane and several hundred insane persons were examined by him." On objection by the petitioner this permission was refused. Counsel for the petitioner sought to have the witness answer a question, "Can you relate a single fact or circumstance in connection with [her] upon which you based your decision that she was insane," in addition to the answer given by the witness, "from my long experience in examining many sane and insane people I reached the conclusion that she was insane." The court instructed the witness to answer the question. The answer quoted was repeated. The petitioner then moved to strike out the testimony of the witness "in its entirety;" and the court denied this motion.
The plaintiff excepted (1) to the overruling of the petition for habeas corpus, as "contrary to law," on every ground of the petition; and (2) to the rulings on the testimony of Dr. Lamarr, but the latter exceptions were not argued or insisted on in the brief for the plaintiff.